IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO

EDWARD J. WIDOK, Jr.,                    )        CASE NO. 1:13-cv-00667
                                         )
                    Plaintiff,           )        MAGISTRATE JUDGE
                                         )        KATHLEEN B. BURKE
            v.                           )
                                         )
COMMISSIONER OF SOCIAL                   )
SECURITY,                                )
                                         )        **MEMORANDUM OPINION & ORDER**
                    Defendant.           )

Plaintiff Edward Widok, Jr. ("Widok" or "Plaintiff") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Commissioner" or "Defendant")

denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social

Security Act (The "Act") and for Supplemental Security Income ("SSI") under Title XVI of the

Act.  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the

undersigned Magistrate Judge pursuant to the consent of the parties.  Doc. 16.  As discussed

herein, the ALJ failed to adhere to the treating physician rule when evaluating Widok's treating

psychiatrist's treatment records and/or opinions.  Additionally, the ALJ concluded that Widok

had moderate limitations in social functioning but did not include any restrictions in the RFC to

account for limitations in social functioning and/or failed to explain why no restrictions were

necessary in the RFC to account for limitations in social functioning.  Accordingly, the Court

**REVERSES AND REMANDS** the final decision of the Commissioner.

## I.  Procedural History

On December 9, 2008, Widok filed applications for DIB and SSI, alleging a disability

onset date of December 1, 2008.[1]  Tr. 142-46.[2]  Widok claimed that he was disabled due to

anxiety, depression, shortness of breath and shakiness, bipolar disorder,[3] vision problems, stroke

and heart problems.[4]  Tr. 88, 96, 184, 219.  The state agency denied Widok's claim initially on

September 24, 2009, (Tr. 87-94), and on reconsideration on March 8, 2010 (Tr. 96-101).  Widok

requested a hearing, (Tr. 102-03), and on April 4, 2011, a hearing was held before

Administrative Law Judge Kurt G. Ehrman (the "ALJ") (Tr. 27-79).  In his decision dated May

16, 2011, the ALJ determined that Widok was not disabled.  Tr. 9-26.  Widok requested review

of the ALJ's decision by the Appeals Council.  Tr. 7-8.  On January 30, 2013, the Appeals

Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr.

1-6.


## II. Evidence

### A.    Personal, educational and vocational evidence

Widok is single, has no children, and lives with his family.  Tr. 193, 415.  He graduated

from high school and attended technical school for about six months.  Tr. 416.  He has worked

various jobs, including as a car salesman, furniture salesman, jet ski operator,[5] service manager,

---

[1] During the administrative hearing, the parties agreed to amend the alleged onset date from June 30, 2005 (Tr. 144), to December 1, 2008 (Tr. 41-44).

[2] Citations to the transcript refer to the Amended Transcript.  Doc. 18.

[3] Although Widok did not originally claim that he was bipolar, he listed bipolar disorder as a new condition in a later disability report.  Tr. 218-19.

[4] In his Disability Report, Widok claimed that he was disabled based on mental and physical impairments.  Tr. 184. However, during the administrative hearing, Widok clarified that his mental impairments were his primary problem. Tr. 35, 62, 64.

[5] Although not listed in Widok's Work History Report, (Tr. 201-08), during the administrative hearing, Widok indicated that he had been employed as a jet ski operator in 2002 (Tr. 53-54). Widok explained that his duties included "selling things on the beach, the cabanas, the jet ski rides . . ."  Tr. 53.

2

furniture installer, boat cleaner, and car detailer.[6]  Tr. 201, 611.

**B.    Widok's mental impairments[7]**

    **1.    Treatment records**

        **a.  Community Health Partners**

On December 15, 2008,[8] Widok presented to the emergency room at Community Health Partners and he was admitted to the psychological floor for further evaluation due to depression, anxiety, auditory and visual hallucinations, and reported suicidal thoughts.  Tr. 325, 327.  Widok mentioned that he had heard noises and had been seeing peripheral visions throughout his life; he also emphasized that there was nothing new about his problems.  Tr. 327.  Widok noted that he had a long history of depression and anxiety because he had not been able to work; he had financial problems; he had recently had a stroke;[9] and he had a stressful life taking care of his elderly adoptive parents[10] and special needs adopted sister, among other things.  Tr. 327.

Dr. Kong Kwon, M.D., opined that Widok had symptoms and signs of psychosis and depression and mixed criteria of major depressive disorder with psychotic features, but no psychotic indicators or cognitive impairment.  Tr. 328.  Dr. Kwon further opined that Widok's social support was a potential protective factor against suicide; however, Dr. Kwon also opined that Widok could resort to suicidal thoughts in a stressful situation.  Tr. 328.  Dr. Kwon

---

[6] Widok was employed to set up detail shops at car dealerships and he also worked as a car detailer.  Tr. 49-50, 237.

[7] Since Widok only challenges the ALJ's findings with respect to his mental health impairments, the medical evidence summarized herein is generally limited to his mental health treatment.

[8] Prior to December 15, 2008, Widok was treated and/or diagnosed by physicians, including his primary care physician Dr. George K. Adams, D.O., for mental and physical impairments.  *See e.g.,* Tr. 293, 298-99, 311-12.

[9] During the hearing, in response to questioning by the ALJ, Widok's attorney noted that treatment notes referenced a TIA (Transient Ischemic Attack).  Tr.  40.

[10] Treatment notes reflect that Widok had contact with his biological mother but his adoptive mother was against the relationship.  Tr. 539.

diagnosed Widok with major depressive disorder with psychotic features and assessed a GAF score of 45.[11]  Tr. 327-28.  Dr. Kwon recommended individual counseling and supportive therapy.  Tr. 328.  He started Widok on Risperdal and continued him on Lexapro and Ativan for his psychotic symptoms.  Tr. 328.

### b.   Nord Counseling Center

Widok also received treatment at the Nord Counseling Center for his mental health issues.  While at the Nord Center, various providers treated Widok, including Dr. Praveen Abraham, D.O.; Ms. Amber Vadini, M.A., a Licensed Professional Counselor; and Ms. Ellen Boehnen, a Licensed Social Worker.  Tr. 359-82, 475-540, 548-52, 591-632.

<u>Assessments/Evaluations</u>

On January 6, 2009, Ms. Vadini performed an Adult Diagnostic Assessment of Widok.[12]  Tr. 360-74.  Widok's symptoms included behavioral and functioning problems.  Tr. 360.  Ms. Vadini noted that Widok had been hospitalized for mental health issues, twice in the late 1980s, and once in December of 2008.  Tr. 363.  Widok stated that his history of hospitalizations was due to suicidal ideations and "what others interpret as trying to kill myself" such as car crashes and overdoses, but he denied that he was trying to harm himself.  Tr. 368.  Widok admitted to using THC, pain killers, and alcohol.  Tr. 368.  Ms. Vadini noted that Widok has had criminal charges in the past.  Tr. 364.

Widok identified his parents as his primary support system; he denied having any

---

[11] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)."  *Id.*

[12] Ms. Vadini noted that Widok presented at the Nord Center based on discharge instructions from his recent hospitalization at Community Health Partners.  Tr. 368.

supportive friendships.  Tr. 361.  Widok reported that his stress had risen to an uncontrollable level over the prior five years, noting that his job was one of his biggest triggers for stress.[13]  Tr. 360.  Widok described his mood as extremely depressed or sad, including depression every day in the prior three months, which would last for the majority of the day.  Tr. 365.  Widok also claimed to have "tons" of anxiety with "ruminating thoughts."  Tr. 365.  Widok claimed that he could not focus on anything, and that he had problems focusing for a few years.  Tr. 366.

Ms. Vadini opined that Widok's risk of harm to self was low.  Tr. 367.  She diagnosed Widok with adjustment disorder with mixed anxiety and depressed mood; rule out anxiety disorder, not otherwise specified; polysubstance dependence in sustained partial remission; rule out depression due to a general medical condition; rule out post-traumatic stress disorder; and rule out major depressive disorder.  Tr. 369.  She assessed Widok with a GAF of 43.  Tr. 369.  Ms. Vadini's recommendations included a psychological evaluation, individual counseling, a possible vocational referral, and PHP.[14]  Tr. 370.

Also, on January 6, 2009, Dr. Abraham completed a psychiatric evaluation.  Tr. 375-377.  Dr. Abraham noted a clear history of depressed episodes lasting two weeks or longer, wherein Widok is depressed, has low interest and energy, trouble concentrating, thoughts of not wanting to be alive, insomnia, and a reduced appetite.  Tr. 375.  When Widok's mood is elevated, he has racing thoughts, he starts talking excessively, he takes on additional goal-directed activity, he carries out impulsive and risky behaviors, and he sleeps very little.  Tr. 375.  Dr. Abraham also noted that Widok had panic attacks on a daily basis, often occupying the majority of the day.  Tr. 375.  Widok's symptoms included feelings of losing control, chills, light-headedness, shortness

---

[13] Widok was unemployed at the time and the assessment does not indicate whether Widok was referring to a particular prior job.  Tr. 360.

[14] "PHP" is a partial hospitalization program.  Tr. 500.

of breath and tachycardia.  Tr. 375.  Dr. Abraham indicated that Widok was cooperative, engaging, interested, and active throughout the interview.  Tr. 376.  Widok's insight was fair to good and his judgment was adequate.  Tr. 376.  His affect was stable.  Tr. 376.  He noted that Widok appeared sincerely motivated to get treatment and to improve.  Tr. 376.

Dr. Abraham diagnosed Widok with bipolar disorder, Type I; anxiety, NOS; cocaine dependence in sustained full remission; and rule out psychiatric disorder secondary to CVA or cardiac illness.  Tr. 376.  Dr. Abraham replaced Widok's Risperdal medication with Zyprexa, continued his Lexapro and, for his significant anxiety, Dr. Abraham increased Widok's Ativan dosage.  Tr. 377.  Dr. Abraham instructed Widok to follow up with him in one month.  Tr. 377.

Treatment notes - group therapists

On April 29, 2009, Widok began attending Wellness Management and Recovery sessions.[15]  Tr. 540.  Less than a month later, Plaintiff reported that the sessions had changed his life.  Tr. 526.  On January 20, 2010, Widok's therapist noted that he was participating adequately in the group sessions, but remained guarded at times.  Tr. 625.  On March 3, 2010, Widok's therapist noted that he struggled that day with self-advocacy, and had difficulty understanding himself and advocating for himself.  Tr. 616.  After the next few meetings, Widok's therapist mentioned that he had not progressed in group, appeared less capable of taking care of himself, and was not utilizing the skills available to him.  Tr. 613, 615.

On October 7, 2009, Widok began attending a Healthy Changes group.[16]  Tr. 510. During group meetings, Widok was educated about nutrition, exercise, and healthy eating and drinking.  Tr. 504-505, 507.  On November 13, 2009, Widok's therapist reported that he was continuing to attend the healthy choices group and liked the social interaction.  Tr. 631.  Overall,

---

[15] April 29, 2009, appears to be the earliest date for attendance at the Wellness Management and Recovery sessions.

[16] It appears that the Healthy Changes group is also referred to as "healthy choices" in treatment notes.  Tr. 506.

Widok's group therapist reported that he was feeling better, his mood was positive, and he had more energy.  Tr. 504, 507.  However, after a November 18, 2009 meeting, the therapist noted that Plaintiff was anxious, depressed, eating minimally, and appeared very tired and run down.  Tr. 630.

Treatment notes - individual therapists

On April 30, 2009, Widok thought his mental health symptoms were worsening.  Tr. 539.  He reported that his adoptive mother had followed him when he was meeting his biological mother and she was angered by the fact that he was maintaining contact with his biological mother.  Tr. 539. PHP was recommended; however, Widok did not want to begin PHP at that time because his mother discouraged mental health treatment.  Tr. 539.  On May 8, 2009, Widok's therapist reported that he was admitted to the Nord unit on May 7, 2009, due to "increased anxiety; feeling out of control of his emotions, and depressive self-talk."  Tr. 537.  He was stressed about Mother's Day because of the conflict between his biological and adoptive mothers. Tr. 537.  He was scheduled to start PHP that day.[17]  Tr. 537, 500.  A few days later, Widok reported feeling increased stress and believed the increase was caused by thinking about his upcoming surgery.[18]  Tr. 525.  On June 11, 2009, Widok indicated that he was relieved to have his surgery complete and reported that his anxiety had lessened.  Tr. 523.

On June 22, 2009, Widok reported that he was motivated to wash his parents' house, wash cars and do yard work, (Tr. 522), and he continued to perform such tasks over the next month (Tr. 520).  Widok acknowledged that he felt that he was progressing because he was motivated to do more activities and be more social.  Tr. 520.  However, he also reported that he

---

[17] On June 10, 2009, it was noted that Widok did not continue with PHP.  Tr. 501.  He was to follow up with his counselor.  Tr. 501.

[18] Plaintiff underwent an ablation procedure on May 26, 2009.  Tr. 442-61.

still felt down, although not as much as he did during the prior month.  Tr. 520.  On July 24,

2009, Widok indicated that he had more energy and could begin participating in activities that he

used to be able to perform but, when he tried to do such activities, he became exhausted and felt

frustrated that he could not do what he once could.  Tr. 519.  During August of 2009, Widok

reported having occasional anxiety attacks and he was continuing to feel stressed about his

decreased functional ability.  Tr. 517.  Also, he reported having some "bad days" during which

he did not get out of bed most of the day.  Tr. 515.  On September 11, 2009, Widok reported that

he continued to have negative self-talk that at times impaired his functioning.  Tr. 514.

However, Widok did acknowledge that he had been more active during the prior few weeks and

that his appetite had returned.  Tr. 514.  In October 2009, Widok reported crying spells and

relationship problems with his biological mother (Tr. 506) but also reported that attending the

healthy choices group was beneficial.  Tr. 506.

On January 7, 2010, Widok told his therapist that the holiday season was stressful and

that he felt he was "not progressing in goal area of increasing stable mood."  Tr. 627.  He

reported having to "sneak" visits with his biological mother.  Tr. 627.  On February 1, 2010,

Widok felt like he was just getting through each day.  Tr. 623.  However, a few days later, on

February 11, 2010, Widok reported that the Geodon medicine was helpful and he felt that he was

in a more stable mood.  Tr. 620.  Widok stated that he had been shopping, visiting with [fri]ends

every day, and walking on the treadmill most days for about an hour.  Tr. 620.  Yet, he also

indicated that he was having, ". . . mood swings and intense 'panic attacks' . . . [and] feeling very

alert, restless, and doesn't feel comfortable in his own skin."  Tr. 620.  Widok reported that

stressful interactions with his mother continued to be a problem, mostly because she was

unsupportive of his decision to pursue mental health treatment.  Tr. 620.

On March 1, 2010, Widok stated that he could not stop crying over the weekend; however, he also mentioned that he might go to Florida within the month to visit a friend.  Tr. 617.  Widok believed that good weather might be helpful for his mood.  Tr. 617.  However, he had some concerns and fears about traveling.  Tr. 617.  Later that month, Widok reported marijuana use about ten times per month for self-medication and stated that he had "little or no stress tolerance" and wondered why.  Tr. 614.  Widok was referred to intake for addiction services.  Tr. 614.  On April 30, 2010, Widok reported an improved mood and motivation and that he felt more like interacting with others.  Tr. 611.  He reported that he had started a small boat cleaning business with another person and that he enjoyed working.  Tr. 611.  He was making about $500.00 per month.  Tr. 611.  He indicated that his food stamps had stopped but he was okay with that because he liked working.  Tr. 611.  He indicated that he had notified SSDI. Tr. 611.

On June 18, 2010, Widok stated that he liked working and wanted to become more independent.  Tr. 609-610.  However, he was concerned about his ability to tolerate work-related stress.  Tr. 609-610.  Widok felt pressure from his parents to work more and felt that his mood instability still interfered with his ability to keep a regular schedule.  Tr. 609.  He at times felt conflicted because he struggled with self-motivation in getting up for work but, once he started working, he felt more productive.  Tr. 609.

On August 16, 2010, Dr. Abraham indicated that Widok's depression and anxiety were persisting.  Tr. 605-606.  He also indicated, though, that Widok was finally responding to treatment with some stability.  Tr. 605-606.  That same day, Widok met with Ms. Boehnen and reported feeling on edge with his emotions and that helping to take care of his special needs sister was draining him physically and mentally.  Tr. 603-604.  Widok had started daily swim

therapy and was hopeful that the therapy would help reduce his pain and anxiety.  Tr. 603.  Ms. Boehnen noted that Dr. Abraham had increased Widok's Cogentin to address the shakiness in his hands.  Tr. 603.

During a September 20, 2010, counseling session, Widok reported stress associated with his sister's upcoming surgery and the fact that he was going to have to be responsible for taking his sister to the surgery and being a liaison with the medical staff.  Tr. 599-600.  During that same session, Widok expressed an interest in registering for a photography course.  Tr. 599-600.  In October 2010, Widok was interested in a more permanent job but was unsure if he could tolerate the stress and the tasks involved with work.  Tr. 597.  He also indicated that the prior few weeks had been hard because the change of seasons triggered his depressed mood.  Tr. 595-596.  In November 2010, Widok reported that his mother had had a stroke and his father was in the hospital.  Tr. 593-594.  He acknowledged that one positive thing had happened – an auto shop hired him to do detailing work and he was looking forward to performing that job.  Tr. 593-594.  In December 2010, Widok stated that he was stressed because he was trying to manage a schedule and take care of his sister.  Tr. 591-592.  He reported feeling like he had no time for himself.  Tr. 591.

### 2.    Medical opinion evidence

#### a.   Treating sources

*Dr. Praveen Abraham, D.O.*

In his treatment notes related to an October 15, 2009, office visit, Dr. Abraham indicated that, after a period of instability, Widok was back in groups and doing fairly stable for the prior three weeks but he also indicated that Widok "appears disabled" and was "still with severe mood swings."  Tr. 508.  In his treatment notes for November 19, 2009, Dr. Abraham indicated that

Widok "appears to be incapable of work." Tr. 629.  He noted that Widok had "no SI [suicidal

ideation] but severe mood swings into depression persist."  Tr. 629.

*Ms. Ellen Boehnen, Licensed Social Worker*

On January 7, 2010, Ms. Boehnen completed a Mental RFC questionnaire.  Tr. 548-52.

Ms. Boehnen rated Widok's ability in 25 functional categories.[19]  Tr. 549-52.  Ms. Boehnen

opined that Widok had unlimited or very good ability to be aware of normal hazards and take

appropriate precautions; maintain socially appropriate behavior; and adhere to basic standards of

neatness and cleanliness.  Tr. 550-51.  She opined that Widok had good ability to accept

instructions and respond appropriately to criticism from supervisors.  Tr. 550.

Ms. Boehnen also opined that Widok had fair ability to understand and remember very

short and simple instructions; carry out very short and simple instructions; sustain an ordinary

routine without special supervision; make simple work-related decisions; perform at a consistent

pace without an unreasonable number and length of rest periods; ask simple questions or request

assistance; get along with co-workers or peers without unduly distracting them or exhibiting

behavioral extremes; respond appropriately to changes in a routine work setting; carry out

detailed instructions; and travel in an unfamiliar place.[20]  Tr. 549-51.  Finally, she opined that

Widok had poor to no ability to remember work-like procedures; maintain attention for two hour

segment; maintain regular attendance and be punctual within customary, usually strict tolerances;

work in coordination with or proximity to others without being unduly distracted; complete a

---

[19] One category – ability to use public transportation – was not rated.  Tr. 551.  Ms. Boehnen made a notation "n/a – doesn't use."  Tr. 551.

[20] In the Mental RFC questionnaire, Ms. Boehnen was asked to explain the limitations that fell into the fair and poor categories and to identify the medical and or clinical findings that supported her assessment.  Tr. 550-51.  She explained that Widok's mood instability and side effects impacted his ability to be alert and focus; his depressive symptoms impacted his memory; and his reported increased anxiety in public situations prevented him from going out in public.  Tr. 550-51.

normal workday and workweek without interruptions from psychologically based symptoms; deal with normal work stress; understand and remember detailed instructions; set realistic goals or make plans independently of others; deal with stress of semiskilled and skilled work; and interact appropriately with the general public.[21]  Tr. 549-52.  Additionally, Ms. Boehnen opined that Widok's impairments or treatment would cause him to be absent from work more than three times per month.  Tr.  552.

*Dr. George K. Adams, D.O.*

A 2008 report from the office of Dr. George K. Adams, D.O., indicates that Widok was diagnosed with recurrent atrial fibrillation, generalized anxiety disorder, panic disorder, and depression.[22]  Tr. 293.  In the report, it is noted that, prior to his cardiac events, Widok had chronic anxiety/panic disorder with occasional incapacitating exacerbations and, since Widok started having cardiac issues, Widok has had "severe incapacitating anxiety as well as weakness, lightheadedness, etc. . . ."  Tr. 294.   It is also noted in the report that Widok was "unable to concentrate, focus, etc."; however, he was able to take care of his personal needs.  Tr. 294.

**b.   Consultative examining psychologist**

Widok underwent an Adult Clinical Interview on May 19, 2009, with Dr. Thomas Zeck, Ph.D.  Tr. 415-20.  Widok felt that both his physical and emotional problems prevented him from working, (Tr. 419), and that he no longer functioned like he used to (Tr. 417).  Widok mentioned that his previous jobs involved high levels of responsibility.  Tr. 419.  Dr. Zeck noted that Widok seemed to have had many jobs for relatively brief periods.  Tr. 417.

Widok claimed that he was horribly depressed and had significant anxiety.  Tr. 417, 419.

---

[21] *See* FN 20 above.

[22] The Bureau of Disability Determination sent Dr. Adams a request for Widok's medical information on December 13, 2008.  Tr. 292. In response, a report was submitted.  Tr. 293-294.  However, it is unclear who prepared or completed the report.  Tr. 292-94.

However, Dr. Zeck noted that Widok did not appear to be horribly depressed during the evaluation and his mood and affect seemed to be appropriate.  Tr. 417.  Also, Dr. Zeck indicated that there were no motor or autonomic signs of anxiety.  Tr. 417.  Dr. Zeck's diagnoses included bipolar disorder and anxiety disorder NOS.  Tr. 419.  Dr. Zeck assessed Widok with a GAF score of 59.[23]  Tr. 419.

Dr. Zeck set forth four opinions regarding Widok's work-related abilities.  Dr. Zeck opined that:

1. This claimant's mental ability to relate to others including fellow workers and supervisors is felt to be mildly to moderately impaired when he is experiencing his emotional problems.  He related well to this examiner and to the office staff on this particular day.  He is able to do ADL tasks and care for aging parents and his special needs sister.

2. This claimant's mental ability to understand, remember, and follow instructions appears to be at least within the average range and not impaired.  He was average in his responses to hypothetical judgment situations.  No comprehension or memory problems were noted.  It is felt that he is mentally capable to understand, remember, and follow instructions.

3. This claimant's mental ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks does not appear to be significantly impaired at this time.  He is able to care for his family according to what he reports.

4. This claimant's mental ability to withstand the stress and pressures of a day to day work activity are felt to be mildly to moderately impaired by his depression and his anxiety when it becomes quite severe.  He needs to be in ongoing treatment as well on medication to work towards dealing with the symptoms that he is expressing of anxiety and depression.[24]

Tr.  419-20.

### c.  State Agency reviewing physicians

On May 30, 2009, Dr. Joan Williams, Ph.D., completed a Psychiatric Review Technique,

---

[23] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  DSM-IV-TR at 34.

[24] Dr. Zeck also opined, "Should he be granted benefits it is felt that he could manage these funds."  Tr. 420.

(Tr. 421-434), and a Mental RFC (Tr. 435-438).  In the Psychiatric Review Technique, Dr. Williams opined that Widok had moderate difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence or pace, and mild restrictions in activities of daily living.  Tr. 431.  Dr. Williams noted that Dr. Abraham had not provided a functional statement.  Tr. 433.

In the Summary Conclusions section of the Mental RFC, Dr. Williams rated Widok's abilities in 20 categories.  Tr. 435-36.  Dr. Williams opined that Widok was moderately limited in his ability to maintain attention and concentration for extended periods; to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and to interact appropriately with the general public; and to respond appropriately to changes in the work setting.  Tr. 435-36.  With respect to the remaining categories, Dr. Williams opined that Widok was not significantly limited or there was no evidence of limitation.  Tr. 435-436.

In the Functional Capacity Assessment section of the Mental RFC, Dr. Williams reviewed Widok's treatment history and prior evaluations, including Dr. Zeck's consultative opinion.  Tr. 437-38.  Dr. Williams gave weight to Dr. Zeck's opinion, opined that Widok's allegations were partially credible; and noted that Widok may under-report the role that recreational substance use plays in his difficulties.  Tr. 438.

On January 19, 2010, on reconsideration, Dr. Cynthia Waggoner, Psy.D., reviewed new evidence in the file, and found that there was not enough substantial new evidence to make a change in the findings.  Tr. 547.  Therefore, Dr. Waggoner affirmed Dr. Williams' May 30, 2009, opinion as written.  Tr.  547.

### C.    Testimonial evidence

### 1.    Widok's testimony[25]

Widok testified that his work history included mostly sales and management jobs, and that he was a car detailer[26] by trade.  Tr. 49.  Widok explained that, although he can still perform detailing work, he is unable to do so under situations involving stress, pressure, or when there are time limits on completing tasks.  Tr. 50-51.  With regard to performing Widok's prior work in sales, he testified that he used to have a good rapport, but that it would now be difficult for him to speak with people because he gets panicky.[27]  Tr. 52.

Widok testified that he had no difficulties with walking or sitting.  Tr. 62.  He goes to the grocery store at night in order to avoid crowds.  Tr. 51.  He does not hate people, but the pressure of quotas and being in long lines causes him anxiety.  Tr. 54.  He will sometimes stay in bed for three days if he is depressed.  Tr. 55.  Feelings of panic cause him to experience increased back pain.  Tr. 60.   He writes many notes and, if he is in a panic situation, he will not remember anything that he does not write down.  Tr. 67.  He sometimes has a hard time focusing during panic situations.  Tr. 67.  Since he knew that he was going to be testifying, per his doctor's suggestion, he doubled up on his medicine to keep him calmer.  Tr. 52-53.

---

[25] In addition to testifying at the administrative hearing, Widok completed a Function Report (Tr. 193-200) wherein he reported that he was not healthy enough to pursue hobbies and he had difficulties sleeping; however, he was able to shop in stores, manage his own money, cook meals, clean, do laundry and yard work for a few hours per day, drive during the day, and care for himself (Tr. 194-97).  With regard to social activities, he reported that he goes to group [therapy], visits with other people, talks on the phone, and goes to church.  Tr. 197.  Widok indicated that it was "hard to deal with people."  Tr. 198.  Widok maintained that, since his condition began, he had been more withdrawn, and was only social in groups and in therapy.  Tr. 197.  Widok claimed that Dewey Furniture fired him because of problems getting along with people.  Tr. 199.

[26] Plaintiff testified that he has worked as a car detailer and that he had also been hired by various car dealerships to set up detail shops, i.e., he would hire the detailers, arrange the process for cleaning the cars, help with inventory, and ensure that the cars would be cleaned.  Tr. 49-50.

[27] Similarly, Widok testified that he becomes very panicky when he is in a group or under pressure.  Tr. 38.

Widok reported that his prescription medications included Ativan, Seroquel, Cogentin, and Geodon for his anxiety and depression. Tr. 55-56. He indicated that he has been sober for at least ten years. Tr. 46. He goes to mental health therapy about once a month with a psychiatrist and once every two weeks with a social worker. Tr. 61-62. He also attends group therapy. Tr. 61. Widok reported that the mental health therapy has helped with his bipolar disorder and depression insofar as it has helped him understand how to use his medication correctly and taught him ways to relieve some stress, such as performing breathing exercises. Tr. 62.

### 2. Vocational expert's testimony

Ms. Nancy Borgeson, the vocational expert (the "VE"), testified that Widok had performed various jobs, including (1) installer, a heavy, semi-skilled (SVP[28] of three or four) job; (2) furniture salesman, a light, semi-skilled (SVP of four) job; (3) a car salesman, a light, skilled (SVP of six); (4) utility salesperson,[29] a light, semi-skilled (SVP of four) job; (5) a self-employed position where Widok set up detail shops, a medium, skilled (SVP of six) job;[30] and (6) detailing, a medium, unskilled job. Tr. 70-72.

The ALJ then posed various hypothetical questions to the VE. Tr. 73-77. The first hypothetical involved a person of the same age and with the same education and work experience as Widok, who could occasionally lift no more than 50 pounds; frequently lift and carry up to 25 pounds; could never climb ladders, ropes, or scaffolds; could occasionally climb

---

[28] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin. December 4, 2000). Using the skill level definitions in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT. *Id.*

[29] The VE was referring to when Widok worked as a jet ski operator. Tr. 53, 72. She indicated that the jet ski operator did not have a Dictionary of Occupational Titles (DOT) number but indicated that the position was best described as a utility sales person. Tr. 72.

[30] The VE indicated that there was no DOT number for Widok's job that involved setting up detail shops so the VE described it as "self-employment." Tr. 72.

ramps and stairs; could frequently balance, stoop, kneel, crouch, crawl; would need to avoid even moderate use of hazardous or moving machinery; would need to avoid even moderate exposure to unprotected heights; would be able to remember one, two, three, four, and five step instructions; and would need to work in an environment that is free of fast-paced production requirements or strict quota requirements. Tr. 73-74. The VE testified that such a person could perform the furniture sales, car sales, and detailing work that Widok previously performed. Tr. 74.

Next, the ALJ added to his original hypothetical that such a person could have only occasional superficial interaction with the general public.[31] Tr. 75. The VE responded that such a person could not perform the sales positions, but could still work as a detailer.[32] Tr. 75-76. The ALJ then added that such a person would be absent from work twice a month and the VE opined that such a person would have difficulty sustaining any type of full-time work. Tr. 77.

Widok's attorney asked two additional questions: whether the inability to maintain attention for two hours at a time or whether the inability to deal with normal stress would affect the individual's ability to work. Tr. 77. The VE testified that a person with such characteristics would have trouble or not be able to sustain full-time work. Tr. 77-78.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

---

[31] The ALJ clarified that he was not limiting interaction with "coworkers and stuff." Tr. 76.

[32] The VE clarified that she was opining that Widok could work as a detailer or as a person hired to set up the detail shops. Tr. 76.

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy . . . .

42 U.S.C. § 423(d)(2).  In making a determination as to disability under this definition, an ALJ is

required to follow a five-step sequential analysis set out in agency regulations.  The five steps

can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe
   before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe
   impairment that has lasted or is expected to last for a continuous period of at
   least twelve months, and his impairment meets or equals a listed
   impairment,[33] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must
   assess the claimant's RFC and use it to determine if claimant's impairment
   prevents him from doing past relevant work.  If claimant's impairment does
   not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based
   on his vocational factors and RFC, he is capable of performing other work that
   exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520; 416.920[34]; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed.

---

[33] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[34] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

2d 119, 107 S. Ct. 2287 (1987).  Under this analysis, the claimant has the burden of proof at

Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

RFC and vocational factors to perform work available in the national economy.  *Id.*

### IV.  The ALJ's Decision

In his May 16, 2011 decision, the ALJ found that:[35]

1.  The claimant meets the insured status requirements of the Social Security Act
    through December 31, 2012.  Tr. 14.

2.  The claimant has not engaged in substantial gainful activity since December 1,
    2008, the alleged onset.  Tr. 14.

3.  The claimant has the following severe impairments: Bipolar Disorder, an Anxiety
    Disorder with Panic Attacks, Degenerative Disc Disease of the Lumbar Spine,
    and Heart Disorder Involving Transient Ischemic Attacks.  Tr. 14.

4.  The claimant does not have an impairment or combination of impairments that
    meets or medically equals a Listing. Tr. 14-16.

5.  The claimant has the RFC to perform medium work except the claimant can never
    climb ladders, ropes or scaffolds, could occasionally climb ramps or stairs, and
    can frequently balance, stoop, kneel, crouch or crawl.  The claimant must avoid
    even moderate exposure to moving or hazardous machinery and unprotected
    heights.  The claimant is able to remember and carry out four to five step
    instructions.  Further, the claimant is limited to working environments that are
    free of fast-paced production requirements or strict quotas.  Tr. 16-20.

6.  The claimant is capable of performing past relevant work.  This work does not
    require the performance of work-related activities precluded by the claimant's
    RFC.  Tr. 20-21.

7.  The claimant has not been under a disability, as defined in the Social Security Act
    from December 1, 2008, through the date of this decision.  Tr. 21.

---

[35] The ALJ's findings are summarized herein.

## V.  Arguments of the Parties

**A.      Widok's Arguments**

First, Widok argues that the ALJ's decision violated the treating physician rule by failing

to address or weigh certain statements made by his treating psychiatrist Dr. Abraham, including

Dr. Abraham's statements that Widok "appears incapable of work" and "appears disabled."  Doc.

14, pp. 1, 4-5; Doc. 20, pp. 3-5; Tr. 508, 629.

Second, Widok asserts that, although the ALJ found that Widok had moderate restrictions

in social functioning, neither the ALJ's RFC nor the hypothetical given by the ALJ to the VE

reflects moderate restrictions in social functioning.  Doc. 14, pp. 1, 5-6; Doc. 20, pp. 5-6.

Third, Widok contends that the ALJ's Step Four finding is faulty because the ALJ failed

to adhere to SSR 96-8p (1996 WL 374184, at *3 (July 2, 1996)), and SSR 82-62 (1982 WL

31386, at * 3 (Jan. 1, 1982)).  Doc. 14, pp. 7-8; Doc. 20, pp. 6-7.  Widok argues that SSR 82-62

requires the ALJ to perform a full investigation of the mental and physical demands of Widok's

past relevant work.  Doc. 14, p. 7.  He also argues that SSR 96-8p requires a function-by-

function comparison of the mental and physical demands of Widok's past relevant work with

Widok's RFC.  Doc. 14, pp. 7-8.  Widok contends that the ALJ erred at Step Four because the

ALJ made no findings about the stressful aspects of Widok's past work, did not discuss whether

Widok's "detailer" work was past relevant work, and/or did not ask the VE for an explanation as

to why limitations in fast-paced production requirements or strict quotas did not affect the

performance of Widok's past work as a salesman or detailer.  Doc. 14, p. 8; Doc. 20, pp. 6-7.

**B.      Commissioner's Arguments**

In response to Widok's first argument, the Commissioner argues that the ALJ thoroughly

discussed the treatment notes concerning Widok's mental impairments and that the ALJ is not

required to discuss every piece of evidence in the record.  Doc. 19, pp. 15-16.  The

Commissioner also contends that Dr. Abraham's conclusory statements relate to an issue reserved to the Commissioner and therefore are not medical opinions entitled to special significance.  Doc. 19, p. 15.  Finally, the Commissioner maintains that Widok actually worked after Dr. Abraham concluded that Widok appeared disabled and incapable of work.  Doc. 19, pp. 15-17.  Therefore, the Commissioner reasons that Dr. Abraham's reports were contradicted by Widok's ability to work.  Doc. 19, pp. 15-17.

In response to Widok's second argument, the Commissioner argues that a limitation found at Steps Two or Three of the sequential analysis does not compel a related restriction in the RFC assessment at Step Four.  Doc. 19, p. 17.  The Commissioner also contends that, despite the limitation of occasional, superficial interaction with the general public, the VE testified that Widok could nevertheless perform his past work as a detailer.[36]  Doc. 19, pp. 17-18.

In response to Widok's third argument, the Commissioner asserts that the ALJ's RFC is supported by substantial evidence and that the ALJ's Step Four finding is properly supported by the VE's testimony and supported by the fact that Plaintiff was able to work part-time as a boat cleaner and as a detailer after he applied for benefits.  Doc. 19, pp. 18-19.

### VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

---

[36] The Commissioner also contends that the ALJ's RFC adequately reflected Widok's credibly established mental limitations because the ALJ concluded that, despite Widok's moderate limitations in social functioning, he could nevertheless perform basic mental work-related activities.  Doc. 19, pp. 17-18.  This argument by the Commissioner is not clearly articulated or developed.  Therefore, the Court declines to address her argument.  *See*, *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (finding that, "Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.  It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones."  (internal citations omitted).

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.     The ALJ violated the treating physician rule by failing to discuss adequately Widok's treating psychiatrist's treatment records and/or provide any reasons for providing no weight to the opinion of Widok's treating psychiatrist**

Widok argues that the ALJ violated the treating physician rule by failing to mention certain opinions rendered by his treating psychiatrist Dr. Abraham in 2009, including his statements that Widok "appears to be incapable of work," (Tr. 629), "appears disabled," (Tr. 508), has "no [suicidal ideation] but severe mood swings into depression persist," (Tr. 629), and that he is "still with severe mood swings" (Tr. 508).[37]  Doc. 14, p. 1, 4.  The Commissioner responds that Dr. Abraham's conclusory statements relate to an issue reserved to the

---

[37] Widok describes Dr. Abraham's statements as opinions whereas the Commissioner describes them as conclusory statements.  While the parties describe the statements differently, the Commissioner does not contend that Dr. Abraham did not treat Widok or provide statements regarding Widok's mental impairments.

Commissioner and, therefore, such statements are not considered medical opinions under the Commissioner's regulations.  Doc. 19, p. 16.  Further, the Commissioner contends that Dr. Abraham's conclusions were contradicted by the fact that Widok actually worked after Dr. Abraham rendered the opinions.  Doc. 19, pp. 16-17.

Since Dr. Abraham was a treating psychiatrist,[38] the ALJ was required to adhere to the treating physician rule when evaluating his opinions.  Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record."  *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. § 404.1527(c)(2).

If controlling weight is not provided, an ALJ must apply certain factors to determine what weight should be given to the treating source's opinion, and the Commissioner's regulations also impose a clear duty on an ALJ always to give good reasons in the notice of determination or decision for the weight given to treating source opinions.[39]  *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011) (citing 20 C.F.R. § 404.1527(d)(2)); *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007) .  "Those good reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion

---

[38] Following his psychiatric evaluation of Widok on January 6, 2009, Dr. Abraham continued to treat Widok.  Tr. 375-77, 381-82, 508, 516, 521, 524, 605-06, 629.  The Commissioner does not contend that Dr. Abraham was not a treating physician.

[39] The factors to be considered are: (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors which tend to support or contradict the opinion.  *Bowen*, 478 F.3d at 747; 20 C.F.R. §§ 404.1527(d), 416.927(d).

23

and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).  "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights [and] [i]t is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he is not.'" *Id.* at 937-938 (citing *Wilson*, 378 F.3d at 544).  Moreover, "the requirement safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the treating physician rule.'" *Id.* at 938 (citing *Wilson*, 378 F.3d at 544-545).  An "ALJ's failure to follow agency rules and regulations denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Cole*, 661 F.3d at 939-940 (citing *Blakely v. Comm'r of Soc Sec*, 581 F.3d 399, 407 (6th Cir. 2009) (internal quotations omitted)).  Inasmuch as 20 C.F.R. § 404.1527(c)(2) creates important procedural protections for claimants, failure to follow the procedural rules for evaluating treating physician opinions will not be considered harmless error simply because a claimant may appear to have had little chance of success on the merits. *Wilson*, 378 F.3d at 546-547.

Opinions on issues reserved to the Commissioner, such as an opinion that an individual is disabled or unable to work, even if rendered by a treating physician, are entitled to no special significance. *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) (citing 20 C.F.R. § 404.1527(e)(3) (2006); SSR 96–5p, 1996 WL 374183 (July 2, 1996)).  However, "[w]hile controlling weight will not be given to a treating physician's opinion on an issue reserved to the Commissioner, the ALJ still must 'explain the consideration given to the treating source's opinion(s).'" *Bass*, 499 F.3d at 511 (quoting SSR 96-5p); *Loy v. Astrue*, 2010 WL 2630036, *10

24

(S.D. Ohio June 9, 2010), *report and recommendation adopted*, 2010 WL 2640058 (S.D. Ohio June 29, 2010) (relying, in part, on *Bass* when remanding case for the ALJ's failure to adhere to the treating physician rule); *see also King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (indicating that an ALJ is not bound by a physician's conclusory statement that a claimant is disabled but noting that good reasons should be provided for not accepting the opinion).

In this case, the ALJ did not discuss or assign any weight to Dr. Abraham's statements that Widok appeared unable to work or appeared disabled or that his severe mood swings persisted.  The ALJ makes one clear reference to Dr. Abraham, noting that Dr. Abraham had evaluated Widok on January 6, 2009, and diagnosed Widok with bipolar disorder, Type 1, anxiety not otherwise specified, and rule out disorder secondary to cerebral vascular or cardiac illness.  Tr. 18 (referencing Exhibit 4F/18, Tr. 376).  Dr. Abraham continued to treat Widok after January 2009 and his October 15, 2009, and November 19, 2009, treatment notes reflect continuing severe mood swings.  Tr. 508, 629.  Without discussing those treatment notes or Dr. Abraham's opinion that Widok appeared disabled or appeared unable to work (Tr. 508, 629),[40] the ALJ proceeded to state that Widok's treatment throughout 2009 "appeared to significantly reduce the effects of the claimant's mental health impairments." (Tr. 18).  Then, after discussing Widok's treatment history, the ALJ discussed and/or weighed the other medical opinion evidence, including opinions from Dr. Zeck, Dr. Williams, Dr. Waggonner, and Ms. Boehnen, but did not mention Dr. Abraham.  Tr. 19.

As the foregoing demonstrates, even though some statements made by Dr. Abraham may

[40] The ALJ generally references treatment notes contained in Exhibit 15F as showing overall improvement in mood, socialization, and affect towards the therapists.  Tr. 18, n. 5.  Exhibit 15F consists of approximately 65 records (Tr. 475-540), a few of which are treatment notes from Dr. Abraham (Tr. 508, 516, 518, 521, 514).  However, the ALJ does not clearly discuss Dr. Abraham's notes.  Additionally, some of Dr. Abraham's notes do not necessarily reflect overall improvement in mood and socialization.  For example, one of Dr. Abraham's treatment notes in Exhibit 15F is the October 15, 2009, treatment record wherein Dr. Abraham indicated that Widok appeared disabled and still had severe mood swings.  Tr. 508.  Also, a treatment note from June 20, 2009, appears to indicate that Widok was more active but still with heavy depression.  Tr. 521.

25

be on issues reserved to the Commissioner or may be cursory in nature, the ALJ failed to clearly

and/or adequately discuss Dr. Abraham's treatment of Widok and/or the ALJ did not clearly

articulate reasons for discounting or dismissing Dr. Abraham's opinions.  *See e.g.*, *Loy* 2010 WL

2630036, *11 (reversing for failure to discuss and provide good reasons for rejecting a

claimant's treating physicians' opinions, which included opinions on issues reserved to the

Commissioner) (relying, in part, on *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 Fed. Appx.

771, 777 (6th Cir. 20*08).  Accordingly, the Court is unable to find that the ALJ sufficiently

complied with the treating physician rule with respect to Dr. Abraham and reversal and remand

is warranted for compliance with the treating physician rule.[41]

**B.    The ALJ's RFC finding and the hypothetical question given by the ALJ to the VE
       are not supported by substantial evidence**

The responsibility for determining a claimant's residual functional capacity rests with the

ALJ.  20 C.F.R. § 404.1546(c).  "[T]he adjudicator's assessment of an individual's RFC may be

the most critical finding contributing to the final determination or decision about disability."

SSR No. 96-5p, 1996 SSR LEXIS 2, at *14 (July 2, 1996).  An RFC assessment is "based on

consideration of all relevant evidence in the case record. . ."  *Id.* at *12.

Widok argues that reversal and remand is warranted because the ALJ found that Widok

had moderate limitations in social functioning but failed to include any social functioning

limitations in the RFC or in the hypothetical question that was the basis for the VE's testimony

on which the ALJ relied to support his finding of no disability.  Doc. 14, pp. 5-6.  In response,

---

[41] Harmless error may apply in some treating physician situations such as (1) where the opinion is so "patently
deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the
treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of
§ 1527(d)(2) . . . even though she has not complied with the terms of the regulation."  *Cole v. Astrue*, 661 F.3d 931,
940 (6th Cir. 2011) (citing *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. 2010).  Here, however,
Defendant does not argue that the ALJ's treatment of Dr. Abraham's opinions was harmless error.  Thus, the Court
will not assess whether harmless error applies.

the Commissioner contends that a limitation found at Step Two or Three of the sequential analysis does not compel a related restriction in the RFC assessment at Step Four.  Doc. 19, p. 17.

Even though an ALJ's finding of a severe impairment at Step Two does not necessarily establish a limitation on an individual's functional capacity to work, *Griffeth v. Comm'r of Soc. Sec.*, 217 Fed. Appx. 425, 429 (6th Cir. 2007), once the ALJ finds a moderate limitation in social functioning at Step Three, the ALJ must either account for the limitation in the RFC or adequately explain why a related restriction was omitted from the RFC.  *See, Gonzalez v. Colvin*, 2014 WL 1333713, at *9 (N.D. Ohio Mar. 28, 2014) (remanding because the ALJ did not explain why her RFC finding omitted social functioning restrictions altogether when the ALJ determined at Step Three of her analysis that plaintiff was moderately limited in his ability to maintain adequate social functioning); s*ee also, Thompson v. Astrue*, 2011 WL 3298904, at *12 (N.D. Ohio Aug. 2, 2011) ("the ALJ gave no indication that he considered plaintiff's moderate difficulties with social functioning, concentration, persistence, and pace.  Clearly, significant limitations in a claimant's mental work capabilities must be accurately accounted for if an RFC finding is to be supported by the record as a whole.").

Here, at Step Three the ALJ found that Widok had moderate limitations in social functioning.  Tr. 15.  Moreover, when discussing and assessing Widok's RFC, the ALJ reaffirmed this finding, stating Widok "does not have more than a moderate limitation in his ability to appropriately interact with others in a workplace setting."  Tr. 20.  Notwithstanding these findings, which are supported by medical opinions to which the ALJ assigned significant weight (Tr. 20),[42] the ALJ did not include *any* restrictions in the RFC to account for limitations

---

[42] For example, the ALJ gave significant weight to the opinions of Dr. Williams and Dr. Zeck.  Tr. 20. Dr. Williams opined that Widok had moderate limitations in social functioning, (Tr. 431), and Dr. Zeck opined that Widok's

in social functioning. Tr. 16. Additionally, the ALJ failed to explain why no restrictions were necessary in the RFC to account for limitations in social functioning. Thus, remand is appropriate.

Additionally, in order for a VE's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray the claimant's physical and mental impairments. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010). In the instant case, although VE testimony was not required at Step Four, the ALJ based his Step Four finding, i.e., that Widok was capable of performing past relevant work as a salesperson and detailer, on the VE's testimony and on Widok's performance of part-time work as a boat cleaner and detailer after he applied for Social Security benefits. Here, the VE hypothetical question did not include limitations in social functioning as found by the ALJ found at Steps Three and Four of the sequential analysis. Thus, since the VE's testimony was given in response to a flawed hypothetical, that testimony does not constitute substantial evidence.[43] *See Vincent v. Comm'r of Soc. Sec.*, 2012 WL 573630, *5 (E.D. Mich. Jan. 31, 2012), *report and recommendation adopted sub nom. Vincent v. Astrue*, 2012 WL 579735 (E.D. Mich. Feb. 22, 2012) ("A vocational expert's response to a flawed hypothetical question cannot serve as substantial evidence sufficient to uphold an ALJ's denial of disability insurance benefits.") (citing 42 U.S.C. § 405(g); *Yoder v. Comm'r of Soc. Sec.*, 2011 WL 6308313, *6 (E.D. Mich. Dec. 16, 2011)).

---

mental ability to relate to others, including fellow workers and supervisors, was mildly to moderately impaired when he was experiencing his emotional problems (Tr. 419).

[43] The ALJ indicated that Widok's ability to perform part-time work was only one piece of evidence demonstrating that Widok is capable of performing past work or other work and was not dispositive on the issue. Tr. 21. Therefore, the ALJ implicitly conceded that the VE's testimony was necessary to support his Step Four conclusion because the ALJ acknowledged that the only other evidence cited was not dispositive as to whether Widok could perform such work. Tr. 21.

The Commissioner suggests that remand is not warranted because the ALJ asked the VE a question with the added limitation of occasional, superficial interaction with the general public, and, in response, the VE testified that, even with that limitation, Widok could nevertheless perform his past work as a detailer.  Doc. 19, pp. 17-18.  However, the ALJ did not rely upon the VE's response to that alternate hypothetical.  Moreover, in concluding that Widok had limitations in social functioning (Tr. 15, 20), the ALJ did not conclude that Widok was only limited in his ability to interact with the general public as opposed to other groups of individuals.  Tr. 20.  Therefore, even if the ALJ had relied on the VE's response to the alternate hypothetical, the Court is not persuaded that that hypothetical adequately portrayed Widok's limitations as found by the ALJ.

For the reasons stated herein, the Court is unable to conclude that the RFC and/or Step Four finding are supported by substantial evidence.  Thus, reversal and remand is warranted.

## C.    Other issues

Widok also presents additional arguments regarding the ALJ's Step Four finding which pertain to the ALJ's inquiry into the demands of his past relevant work.  On remand, the ALJ's evaluation of Dr. Abraham's treatment records and opinions and/or or the formulation of an RFC and VE hypothetical based upon the finding that Widok had limitations in social functioning may impact the Commissioner's ultimate finding at Step Four.  *See Trent v. Astrue*, Case No. 1:09CV2680, 2011 U.S. Dist. LEXIS 23331, at *19 (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).  Thus, this Opinion does not address those additional arguments.

**VII. Conclusion**

For the foregoing reasons, the final decision of the Commissioner denying Widok's application for disability insurance benefits and supplemental security income is **REVERSED AND REMANDED**.[44]

Dated: August 15, 2014

_____
Kathleen B. Burke
United States Magistrate Judge

---

[44] This opinion should not be construed as requiring a determination on remand that Widok is disabled.